Mike Arias, Esq. (SBN 115385)
    mike@aswtlawyers.com
Arnold C. Wang (SBN 204431)
    arnold@aswtlawyers.com
Alfredo Torrijos, Esq. (SBN 222458)
    alfredo@aswtlawyers.com
**ARIAS SANGUINETTI**
    **WANG & TORRIJOS, LLP**
6701 Center Drive West, 14th Floor
Los Angeles, CA 90045
Tel: (310) 844-9696
Fax:(310) 861-0168

Jasmine Duel, Esq. (SBN 271872)
    jasmine@berokhimduel.com
Kousha Berokim, Esq. (SBN 242763)
    berokim@berokimduel.com
**BEROKIM & DUEL, P.C.**
270 North Cañon Drive, Third Floor
Beverly Hills, CA  90210
Tel: (818) 703-8985
Fax: (818) 703-8984

*Counsel for Plaintiff Heather Endresen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER ENDRESEN, an individual,<br><br>    Plaintiff,<br><br>    vs.<br><br>BANC OF CALIFORNIA, INC., a Delaware Corporation; and BANC OF CALIFORNIA, N.A., a United States National Banking Association,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Heather Endresen ("Plaintiff"), through undersigned counsel alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to all other allegations.  Plaintiff brings this action for damages and restitution against defendants Banc of California, Inc. and Banc of California, N.A. (collectively, "Defendants" or "Banc"), demanding a trial by jury.

## JURISDICTION AND VENUE

1.     The first claim for relief for violation of Sarbanes-Oxley Act, codified at 18 U.S.C. § 1514A, arises directly under federal law.  As such, the Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1331 and under principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

2.     Defendants conduct business and maintain their executive headquarters in this District.  Accordingly, this Court has personal jurisdiction over Defendants because they conduct business in California and have sufficient minimum contacts with California.

3.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendants have caused harm to Plaintiff in this District.

4.     Plaintiff has exhausted any and all administrative remedies required to file this complaint.  On October 26, 2017, Plaintiff timely filed a complaint of Sarbanes-Oxley retaliation with the United States Department of Labor and the Department did not issue findings or recommendations within the statutory one hundred and eighty days, thus permitting a direct lawsuit by Plaintiff in federal court.  On October 30, 2017, the California Department of Fair Employment and Housing issued to Plaintiff a Notice of Case Closure and Right to Sue.

## THE PARTIES

5.     Plaintiff, Heather Endresen ("Plaintiff"), is a resident of Orange County, California.  Ms. Endresen worked for Banc from approximately March 17, 2014 until her

**COMPLAINT**

wrongful termination on May 29, 2017, as Managing Director, SBA Lending, in Orange County California.

6.     On information and belief, Banc of California, Inc. ("Banc Inc."), which does business in California as Banc of California Holding Company, is a Delaware corporation with its corporate headquarters in Santa Ana, California.  Banc Inc. is a bank holding company regulated by the Federal Reserve Board and is the holding company of defendant Banc of California, N.A.   Defendant, Banc Inc., is a publicly-held and publicly-traded company listed on the New York Stock Exchange ("NYSE") under the ticker symbol "BANC," with securities registered under section 12(g) of the Securities Exchange Act of 1934.

7.     On information and belief, Banc of California, N.A. ("Banc N.A.") is a United States National Banking Association, with its principle place of business in Santa Ana, California.   Banc N.A. is a wholly-owned subsidiary of defendant Banc of California, Inc.

## JOINT EMPLOYER ALLEGATIONS

8.     Plaintiff is informed and believes, and based upon that information and belief alleges, that at all relevant times herein, there existed by and between Defendants, and each of them, an arrangement to share Plaintiff's services and to suffer or permit the work of Plaintiff.   As such, each defendant was acting in the interest of the other in relation to Plaintiff and shared control of Plaintiffs.

9.     At all relevant times herein, Defendants directly or indirectly employed and exercised significant control over, or had the right to control, the wages, hours and working conditions of Plaintiff.

10.     Plaintiff is informed and believes, and based upon that information and belief alleges, that that at all relevant times herein, each defendant designed, controlled, monitored, maintained, and/or enforced the labor policies and practices of the other defendants.

11.     Plaintiff is informed and believes, and based upon that information and

belief alleges, that at all relevant times herein, Defendants engaged in a common course of conduct in violation of California law, as alleged in this Complaint.

## GENERAL FACTUAL ALLEGATIONS

**A.   Plaintiff Is Hired by Banc and Enters into an Employment Agreement with Banc.**

12.   In or about March 2014, Banc hired Ms. Endresen as "SVP, SBA Lending" with a hire date of March 17, 2014.

13.   Although Ms. Endresen was originally hired as an "at-will" employee, in or about April 2015, Plaintiff and Banc entered into a written employment agreement (the "Employment Agreement") for the position of "Managing Director, SBA Lending."

14.   The Employment Agreement had an effective date of April 1, 2015 and was, per the agreement, intended to "amend, restate and/or supersede the previous employment arrangements."

15.   The Employment Agreement had a term of one year, which on each year anniversary would be "extended for one additional year unless Employer notifies Employee at least ninety (90) days prior to such Renewal Date that the term of this Agreement will not be so extended."  Banc never informed Plaintiff that the term of the Employment Agreement would not extended.  Accordingly, as of April 1, 2017, the Employment Agreement was, by its own terms, extended to April 1, 2018.

16.   The Employment Agreement provides that "[i]n the event of the termination of Employee's employment, *for any reason*, Employee shall be entitled to any Accrued Obligations (as defined below), which shall be paid by Employer as soon as reasonably calculable but no more than thirty (30) days following the termination date." [Emphasis added.]  "Accrued Obligations" is defined in the Employment Agreement as, "(i) any earned but unpaid compensation through the date of termination, (ii) any accrued but unused vacation time through the date of termination, (iii) any business expenses that are reimbursable under Section 6 that were incurred by Employee as of the Employee's termination of employment but have not been reimbursed on the date of termination,

subject to the submission of any required substantiation and documentation, and (iv) any payments or benefits to which Employee or his beneficiary or estate is entitled under the terms of any applicable employee benefit plan."

17.     The Employment Agreement additionally provides:

> In the event that Employer terminates Employee's employment prior to the Term End Date without Cause or Employee resigns with Good Reason, and only under these circumstances, Employee shall be entitled to (i) severance pay in an amount equal to the Monthly Base Salary (Defined as Base Salary divided by twelve (12)) in effect on the Commencement Date multiplied by the number that is the lesser of eighteen (18) and the number of months remaining prior to the Term End Date as of the date of termination ("Severance Pay"), and (ii) accelerated vesting in full of the Signing Grant, to the extent not theretofore fully vested (collectively with the Severance Pay, the "Severance Benefits"). In the event that Employer terminates Employee's employment without Cause after the Renewal Date, Employee shall be entitled to Severance Pay equal to the Monthly Base Salary multiplied by the lesser of (6) months and the number of months remaining prior to the next Renewal Date.

18.     The Employment Agreement provides that: "Employee may terminate employment hereunder for Good Reason as set forth in Paragraph 10(e)(C)."   The Employment Agreement defines "Good Reason" as follows:

> "Good Reason" shall exist if, without Employee's written or oral consent, Employer materially breaches a financial obligation of this Agreement; provided however, that, Good Reason shall not exist so long as Employee maintains the title possessed at Employer or any affiliate immediately before any claim of Good Reason, or a higher position at Employer or any affiliate; and provided further that, Good Reason shall not exist if Cause exists. Employee may terminate employment hereunder for Good Reason within sixty (60) days following the occurrence of any condition constituting Good Reason, provided however that Employee has first provided written notice to Employer specifying in reasonable detail and satisfactory to Employer the condition giving rise to the Good

Reason given, Employee has provided Employer with a period of sixty (60) days to remedy the condition (and the notice so specifies), and Employer has failed to remedy the condition within this sixty (60) day period.

**B.    Allegations in October 2016 Article Results in Dramatic Fall in Share Price and Shake-Up of Banc's Upper Management and Board of Directors.**

19.    On October 18, 2016, the website SeekingAlpha.com published an article entitled "BANC: Extensive Ties To Notorious Fraudster Jason Galanis Make Shares Un-Investable."   The article claimed that Banc's then Chairman, President and Chief Executive Officer, Steven A. Sugarman, and Banc's then Board of Director member, Chad T. Brownstein, had ties to Jason Galanis – a convicted felon with a reputation for looting public companies.   Banc shares fell $4.61 per share, or 29%, the day this news was reported.

20.    On October 27, 2016, Banc formed a special committee of directors to investigate the allegations raised in the Seeking Alpha report.

21.    On January 23, 2017, Banc announced that Mr. Sugarman had resigned from all positions with Banc and that it had entered into an "Employment Separation Agreement and Release" with Mr. Sugarman which provided, *inter alia*, that Banc would pay or provide Mr. Sugarman "(a) his 2016 annual bonus in the amount of $1,500,000, payable on January 31, 2017; (b) a payment of $1,040,000 on January 31, 2017; (c) a payment of $360,000, payable on the first payroll date after the six month anniversary of the Effective Date; (d) a payment of $1,350,000, payable in equal installments commencing on the first payroll date following the six months anniversary of the Effective Date and continuing through the twelfth month following the Effective Date; (e) medical and dental benefits to Mr. Sugarman and his eligible dependents, as if he were an employee, for three years following the Effective Date[.]"

22.    On February 9, 2017, Chad T. Brownstein retired from Banc's Board of Directors and, concurrently therewith, entered into an agreement and release, providing

that the outstanding unvested equity awards held by Mr. Brownstein vested in full.

23. On or about March 13, 2017, Jeffrey T. Seabold, who at the time was Banc's Executive Vice President and Vice Chairman of the Banc, was involuntarily placed on indefinite administrative leave.

24. On January 23, 2017, Banc announced that it had appointed Hugh F. Boyle as Interim Chief Executive Officer and J. Francisco A. Turner as Interim President and Chief Financial Officer.

25. On February 7, 2017, Richard Lashley was appointed to Banc's Board of Directors. As explained in Banc's 2016 annual report: "Mr. Lashley is a co-founder of PL Capital Advisors, LLC (PL Capital Advisors). PL Capital Advisors and certain affiliates of PL Capital Advisors, including Mr. Lashley (collectively, the PL Capital Group), beneficially own approximately 6.9 percent of the Company's voting common shares."

26. In or about January 2017 (at about the time of his appointment as Interim President and Chief Financial Officer) Ms. Endresen began reporting to Mr. Turner.

**C.    Facing the Risk of Not Meeting Earnings Expectations for the First Quarter of 2017, Banc Devises and Implements a Scheme to Improperly and Unlawfully Increase Income.**

27. On January 30, 2017, Banc issued a press release touting its "Record 2016 Earnings." That press release stated in part:

> Banc of California, Inc. […] today reported net income of $33.3 million, and net income available to common stockholders of $28.2 million, for the fourth quarter of 2016, resulting in diluted earnings per share of $0.54 for the quarter and $1.94 for the full year. Net income for the full year was $115.4 million, *an increase of 86% compared to 2015*. Net income available to common stockholders for 2016 grew to $95.5 million, *an increase of 83% compared to FY 2015*.
>
> [¶]

**COMPLAINT**

"Our fourth quarter results capped off a strong finish to a successful 2016," said Hugh Boyle, Interim Chief Executive Officer of Banc of California. *"We have invested a great deal of resources into attracting and developing talented, entrepreneurial employees. I would like to thank all of my colleagues for our record 2016 results which are a strong reflection of their hard work and dedication.* As we look to 2017 with a fresh perspective, our foundation continues to be our mission and vision as California's Bank. Our objectives for 2017 are focused on four key pillars: responsible and disciplined growth, strong and stable asset quality, focus and optimization of our business, and strong corporate governance. We are confident that we can continue to execute and deliver strong financial returns for shareholders."

"For both the quarter and the full year, *we exceeded each of our stated financial targets*, producing full-year return on assets of 1.1% and full-year return on tangible common equity of 17.0%," said J. Francisco A. Turner, Interim President and Chief Financial Officer of Banc of California.

[Emphasis added.]

28.     At the same time that Mr. Boyle was thanking Banc's employees for the company's "record 2016 results which are a strong reflection of their hard work and dedication," and Mr. Turner was touting that Banc had "exceeded each of our stated financial targets," Banc's (new and recently reshuffled) upper management and Board of Directors were painfully aware that Banc was at serious risk on failing to meet earnings expectations for the first quarter of 2017.

29.     Rather than revise Banc's first quarter 2017 earnings guidance downward – and risk a further drop in stock prices and repercussions to the new upper management team and Board of Directors – Banc elected to engage in a scheme whereby it would not pay the full 2016 incentive bonuses that it had accrued as a liability on its 2016 balance sheet and would reverse this accrued incentive bonus liability in 2017 (so as to increase income for the first quarter of 2017) rather than 2016 (which would have increased income for the fourth quarter of 2016).

30.     Since Banc's principle – if not sole – goal was to increase its first quarter 2017 earnings, it was not enough simply to renege on its obligations to pay its employees (including Plaintiff) the 2016 bonuses to which they were entitled.  After all, reversing the 2016 bonus accruals in 2016 would serve only to increase income in 2016, which was already a record year and which, in any event, was not really attributable to the new upper management.  Instead, it was necessary for Banc to *both* renege on its obligations to pay the accrued 2016 bonuses *and* reverse those allocation in 2017 (rather than 2016) – only then would this result in an increase in 2017 income.  Not only did this scheme run afoul of generally acceptable accounting principles, it relied on blatant misrepresentations by Banc to the SEC and investors.

31.     Internal memorandums sent to Banc executives to explain the reduced bonus pool contained language that contradicted the public disclosures about the company's 2016 performance.  Thus, while Banc was publicly touting that it had "exceeded each of [its] stated financial targets" for 2016, it was concurrently telling its managers (including Plaintiff) that their promised bonuses for 2016 would have to be reduced because the company did not meet its 2016 objectives.  Obviously, both statements could not be true.

32.     On May 10, 2017, Banc filed its 10-Q for the three months ended March 31, 2017.  Banc addressed the reversal of the accrued 2016 bonus liability in this 10-Q, stating:

> At December 31, 2016 the Company accrued a liability for estimated discretionary incentive compensation payments to certain employees.  The amount paid was less than the accrued liability.  Consequently, the Company reversed the excess accrual and recorded a credit to salaries and employee benefits on the consolidated statements of operations of $7.8 million during the three months ended March 31, 2017.  ***The reversal, based on new information driven by changes to certain facts and circumstances, was determined to be a change in***

— 9 —

**COMPLAINT**

*estimate*.

[Emphasis added.]

33.     Banc fails to disclose what "new information driven by changes to certain facts and circumstances" accounted for the "change in estimate." However, its justification for reversing the accrued liability in 2017 rather than 2016 is utterly specious given that Banc had already decided that it would not be paying the full bonus that it had accrued for 2016 long before the March 1, 2017 filing date of Banc's 2016 10-K.  In other words, whatever the putative "new information" justifying the Banc's decision to renege on paying the full 2016 bonuses that it owed its employees, that "new information" was certainly known prior to the date that Banc filed its 2016 10-K and, as such, the reversal, if it was to be made at all, should have been reflected there.

34.     The effect of Banc's scheme to improperly inflate earnings for the first quarter of 2017 was significant.  Through its scheme Banc was able to report net income of $12.088 million for the first quarter of 2017.  While this is less than the $15.112 million in net income that Banc reported for the first quarter of 2016, without the $7.8 million reversal, Banc's net income for the first quarter of 2017 would have only been about $4.288 million.  Stated differently, the $7.8 million reversal accounted for nearly 65% of the net income reported by Banc for the first quarter of 2017.

**D.     Plaintiff Informs Her Supervisors, the Board of Directors and Others at Banc with Authority to Investigate and Terminate the Misconduct About the Unlawful Activity Occurring at Banc; Instead of Conducting a Serious Investigation of the Claims, Banc Threatens and Harasses Plaintiff.**

35.     Banc purports to strictly uphold its Code of Business Conduct and Ethics, which according to Banc's own policy is "intended to deter wrongdoing and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.  The Code is also intended to promote full, fair, accurate, timely and understandable disclosure in documents Banc of

California, Inc. files with, or submits to, the Securities and Exchange Commission (the 'SEC') and in all other public communications made by the Corporation."

36.    Banc's Code of Business Conduct and Ethics further requires employees to report any known or suspected violations of the code. However, when Ms. Endresen honored and followed by submitting serious, substantive complaints about the Banc's actions and its new this code in executing the directives set out in this code by making very serious complaints against Banc and its new Interim President and Chief Financial Officer, J. Francisco A. Turner, Plaintiff was threatened and harassed.

37.    Moreover, Sarbanes-Oxley makes clear that a company's senior officers must follow the same rules they set for their employees and are responsible for the culture created at the workplace.  To ensure "tone at the top" has real meaning, SOX requires that the CEO and Board of Directors of a company ultimately be responsible for the quality of a company's disclosure and financial reporting.  SOX requires that the CEO and the Board ensure that all material information – both financial and non-financial – gets to those responsible for reporting it to the investing public and senior officials cannot create an environment in which employees are afraid to discuss or act on potentially serious misconduct that comes to their attention.

38.    While working at Banc, Ms. Endresen noticed a break down in the "tone at the top" due to Mr. Turner's, and other's actions, evidenced by his knowledge of accounting irregularities and false financial disclosures, drug use, and sexual harassment in the workplace.  Mr. Turner and the Board created and perpetuated a "tone at the top" problem by perpetuating these unlawful actions and by creating an environment where Ms. Endresen was retaliated against for complaining about such misconduct.

39.    Between January and March 2017, Mr. Turner, among others, informed Ms. Endresen, that Banc had decided to scale back Banc bonus pool, and consequently, certain employee bonuses would be reduced.  However, despite the reduction in the 2016 bonuses, Banc shifted over $7 million of earnings from 2016 to 2017 by reversing the already accrued and promised bonuses, among other serious accounting irregularities.

40.     Banc issued a "reassessment" of accruals for 2016 bonus.  This resulted in reversing $7.8 million in accruals, which was then credited towards liabilities accrued in first quarter of 2017.  It also resulted in earned performance-based bonuses not being paid to Plaintiff, and others, despite Banc's obligation to do so.   These accruals never should have been reversed.  Basic and lawful accounting dictates that revenues generated in one fiscal year cannot be carried over to another.  Those bonus accruals were recognized in 2016, and to "reassess" them for purposes of Q1 2017 earnings is improper and paints a misleading and inaccurate picture of the Banc's continued operating Earnings Per Share for that period.  In short, Banc misrepresented its earnings to the public.

41.     Ms. Endresen reasonably believed that this sham accounting violated Sarbanes Oxley.  Consequently, on March 22, 2017, Ms. Endresen met with Mr. Turner to discuss, among other things, her compensation, her bonus, and the accounting misrepresentations made on Banc's public filings in violation of Sarbanes Oxley.  Mr. Endresen expressed that she did not feel comfortable with Banc's illegal behavior.  In no uncertain terms, Mr. Turner threatened Ms. Endresen's professional reputation by committing to act vindictively both at Banc or any other subsequent employment if she rocked the boat and/or resigned from her position.

42.     On March 24, 2017, Ms. Endresen called Banc's whistleblower hotline and reported the following illegal behavior in the workplace: Sarbanes Oxley violations, including but not limited to willful misrepresentations on Banc's public filings.

43.     On March 28, 2017, Ms. Endresen met with Hugh Boyle, Banc's interim Chief Executive Officer, and Mike Urtel, Banc's Director of Human Resources.  Ms. Endresen requested a board member be present, but Mr. Urtel threatened to retaliate against Ms. Endresen if she failed to cooperate without a board member.  During this meeting, Ms. Endresen again complained about Banc's Sarbanes Oxley violations, irregular accounting, gender discrimination, and Mr. Turner's harassing and threatening behavior towards her.  Ms. Endresen also complained about Banc's failure to address her compensation plan as previously promised.

**COMPLAINT**

44.     In early April 2017, Ms. Endresen met with Michael Gelormino, Banc's Chief Internal Audit Officer, and Banc's Director Richard Lashley, to again complain about illegal conduct in the workplace, specifically Sarbanes Oxley violations.   Ms. Endresen requested and Banc agreed, to record this conversation.   Ms. Endresen gave a detailed explanation of the accounting irregularities engaged in by Banc, misrepresentations on public filings, bonus accrual reversal, internal statements being in conflict with external statements relating to Banc's 2016 performance, the bonuses she was deprived of, and retaliation she experienced from Mr. Turner.   In addition, she complained of the recent culture of fear and retaliation, in which previously respected executives and managers were being scapegoated, and suddenly terminated.   She complained that the "tone at the top" referenced in public disclosures was actually much worse at that present time, than it had ever been in the past.

45.     It is also important to note, Ms. Endresen expressed concern over any investigation Michael Gelormino and Richard Lashley engaged in relating to the accounting irregularities because she did not believe they were able to conduct an impartial investigation because Mr. Lashley advised Ms. Endresen directly during the investigation, that he himself, was central in making the decision and also responsible for investigating his own decision.   When Ms. Endresen pointed this out to him, he discontinued all further communication, and Ms. Endresen was later warned that she would be terminated if she communicated directly with a Director concerning a complaint again.

46.     On April 25, 2017, in an email to Michael Gelormino, Ms. Endresen requested a response to her whistleblower complaints relating to the public filings.   Ms. Endresen also complained about Mr. Turner's illegal misappropriation of corporate funds by paying for employees, clients, and analysts to go to strip clubs on Banc's dime.   Moreover, Ms. Endresen also complained about the air of hostility and discrimination directed at female employees.   Specifically, she complained of male employees having sex with women in their work offices and visiting strip clubs with employees.

47.     Ms. Endresen also complained of Mr. Turner's illegal drug use.   She complained that not only did he engage in illegal drug use while at work, but that he pressured other employees to engage in this drug use with him.  Ms. Endresen believed this was a health and safety issue, as well as a SOX matter since as CFO, Mr. Turner was signing off on the financial statements of the Bank during this time.

48.     On May 1, 2017, in an email Ms. Endresen complained that she believed that Banc's reduced bonus payout was not applied consistently among employees, and later expressed that those employees that condoned Mr. Turner's discriminatory behavior and/or drug use and/or turned a blind eye to accounting violations received higher discretionary bonuses.  She had direct and specific knowledge that the merit increases were applied in this manner, with most employees receiving no increase and those who were complicit with Fran's behavior receiving large percentage salary increases during a time when the bank was focused on cost-cutting and was laying off hundreds of employees.

49.     Moreover, Ms. Endresen specifically requested that the Sarbanes Oxley coordinator – Poe Gannt – be contacted to resolve the accounting irregularities that were publicly filed and to explain negative effect of the Reduction in Force at the company.  Ms. Endresen believed that not only was the drug use illegal, but that Mr. Turner's drug use compromised his ability to comply with the Sarbanes Oxley rules and regulations.

50.     On May 9, 2017, Ms. Endresen made a written complaint to Doug Bowers, Manisha Merchant, and Mike Urtel as follows:

> I am very concerned that the bank continues to erode my sense
>
> of trust and fairness, and to let me down as an employee that is
>
> trying to call attention to a huge reputation risk and to possible
>
> criminal behavior of an executive.

51.     Beginning in mid-May the company, specifically Mike Urtel and in-house counsel, Manisha Merchant, sent Ms. Endresen a series of baseless memos purporting to investigate her claims.  However, it is overwhelmingly clear that Banc did nothing other

than dismiss her claims, side with Fran Turner, and threaten to fire her if she made further complaints of illegal conduct directly to Board Members.

52. In May 2017, Ms. Endresen was called to a meeting with the head of Human Resources, Mike Urtel, Banc Counsel, Manisha Merchant and acting CEO, and Chief Risk Officer, Hugh Boyle. The purpose of the meeting was to inform Ms. Endresen that she would be terminated if she went to a Director with a complaint. The Bank agreed with Ms. Endresen when she pointed out that she had followed all protocols and procedures in making her whistleblower complaints and that Director Lashley had in fact reached out to meet with her, following her request. Therefore, the purpose of the meeting was not to correct Ms. Endresen; instead it was clearly an attempt to intimidate her from further complaints. To Ms. Endresen's knowledge, she was the only employee singled out for such a dramatic meeting that was purported to instruct her on proper procedure. Furthermore, this communication, in addition to being a violation of Sarbanes Oxley, was in direct conflict with the actions of Hugh Boyle and the Board of Directors during the time following Mr. Sugarman's departure. Ms. Endresen was invited to a meet and greet one evening at Banc headquarters in Santa Ana, with all of the Directors, including Mr. Lashley who had just been appointed. At this meeting, Director Halle Bennet stated during a conversation with Ms. Endresen and another manager, that the Directors wanted much more direct communication and contact with the employees. Such communication was strongly encouraged, until Ms. Endresen made her complaints.

53. Mike Urtel provided a memo to Ms. Endresen on May 11, 2017. In that memo, Banc sided with Mr. Turner on serious issues and most shocking, threatened to terminate Ms. Endresen if she directly communicated illegal workplace conduct to board members. Specially, the memo states:

> Employees are required to direct complaints to their manager, Human Resources, or in the event of conflict, Legal. As you know, employees may also avail themselves of the Whistleblower Hotline. *However, employees may not*

> *circumvent these established channels and communicate to any*
> *Board member they want regarding their employment concerns.*
> *As a reminder, any employee who fails to follow these*
> *established procedures may be subject to discipline, up to and*
> *including termination.*"

[Emphasis added.]

54.     On May 12, 2017, Ms. Endresen had a meeting with Manisha Merchant regarding company expense policies, specifically using corporate funds to pay for strippers, and also engaging in sexual conduct at the workplace.     Shockingly, Ms. Merchant explained that the company does not have a policy prohibiting employees from engaging in sexual activity in the workplace, or a policy against using corporate funds to pay for strip clubs.

55.     On May 15, 2017, Mike Urtel sent Ms. Endresen another memo relating to her complaints regarding Mr. Turner, specifically Mr. Turner having sex with employees in his office and his drug usage.   Banc completely dismissed Ms. Endresen's claims of sexual harassment and consequently did almost nothing to investigate these complaints as evidenced by Mr. Urtel's statement, "the complaints you have submitted to us regarding Mr. Tuner have been more akin to rumor or gossip."

56.     Also on May 15, 2017, Mike Urtel sent Ms. Endresen another memo relating to her complaints of illicit drug use. Specifically, Ms. Endresen complained of Mr. Turner's drug use and him coercing junior employees to engage in said drug use with him.   In the memo, Mr. Urtel states, "we also ask, as a senior officer of the organization, that you should be careful when making accusations based solely on unsubstantiated rumors or gossip.   Moreover, it appears that many of these complaints are based more on some personal animosity you have against Mr. Turner rather than on legitimate concerns based on facts,"

57.     Moreover, Manisha Merchant sent an email on May 16, 2017, stating, "we cannot continue to investigate your claims that are based solely on unsubstantiated

rumors, gossip and innuendo…. Based on the number of complaints you have made, and the fact that many were against Mr. Turner and based solely on rumors without any factual support, it appears to us that this is more about a personal grudge you have against him rather than legitimate concerns about workplace issues."

58.     It is important to note that before Ms. Endresen made complaints of illegal conduct, she was in the process of renegotiating her 2016 bonus, and a new compensation and bonus structure for 2017.  Ms. Endresen brought in millions of dollars for Banc and she was promised a substantial raise.   Not surprisingly, after she made her complaints, Banc refused to change her pay, and even worse, her 2016 bonus was severely negatively impacted because she refused to turn a blind eye to the SOX violations and Mr. Turner's illegal behavior.

59.     Both Human Resources and in house legal counsel accused Ms. Endresen of being motived by personal vendetta, did not take her complaints seriously, and failed to conduct a meaningful investigation with impartial witnesses. Banc did not call the witnesses identified by Ms. Endresen, refused to provide her with the findings of any internal audit report, refused to modify its public disclosure reports in violation of the Sarbanes Oxley, refused to drug test Mr. Turner, and repeatedly threatened to fire her if she made complaints directly to the board of directors. In fact, the new CEO Doug Bowers had no trust in Ms. Endresen's ability and/or credibility and accused her of recording their conversations without his permission when that was certainly not the case. The complete breakdown in the employment relationship prevented Ms. Endresen from performing her job, and Banc would not pay her the monies she was entitled to.

**E.     In Order to Silence Plaintiff, Banc Assigns Her to Its "Disclosure Committee" in the Hope of Making Plaintiff Complicit in Banc's Unlawful Activities.**

60.     In the first quarter of 2017 Ms. Endresen was added to Banc's Disclosure Committee.  Ms. Endresen was given no explanation for why she was suddenly added to the Disclosure Committee and she necessarily presumed that her addition to the

committee was done to make her complicit in and spread culpability for the Banc's false public disclosures.

61.     On April 24, 2017, Ms. Endresen met with Mr. Gelormino to discuss her complaints.  In an April 25, 2017 email to Mr. Gelormino regarding the previous day's meeting, Ms. Endresen wrote, in relevant part:

> I asked that a response on my whistleblower complaints that relate to public filings be provided before this Friday's Disclosure Committee meeting.  I explained that, depending on the response, I may wish to disclose to the committee the concerns and the responses so that the members will have benefit of the information before the next filing.  I expressed concern that one of my complaints (that we stated we would be "adding capable resources" to correct the material weakness in financial controls, but we have instead been cutting staff in these job functions) may not be going in the direction I had hoped because to my knowledge there is a list for our next round of layoffs which may include up to 14 people from Loan Servicing…..which is a critical area that has not functioned optimally even at the historic larger staffing levels. I also asked that the materials for the Disclosure Committee be distributed to allow ample time for the members to at least read them. Last time, we did not have enough time.

62.     As noted in Ms. Endresen's email, the Disclosure Committee was supposed to meet on Friday, April 28, 2017 to discuss the disclosures related Banc's release of information related to its first quarter of 2017 financial results – the very results which, as discussed above, were being improperly inflated by the illegal reversal in 2017 of the 2016 accrued incentive bonus.  The upcoming Disclosure Committee meeting, however, was suddenly canceled on Wednesday, April 26, 2017.  Ms. Endresen sent an email to Mr. Gelormino asking whether the cancelation had anything to do with the request she had made on Monday, April 25, 2017 that she be provided with a response to her "whistleblower complaints that relate to public filings" prior to the Disclosure Committee meeting.  Mr. Gelormino responded that the cancellation had nothing to do with her request but was, instead, "a timing issue for earning release."

**COMPLAINT**

63.     The Disclosure Committee was subsequently rescheduled for Monday, May 1, 2017 at 5:00 p.m. and, despite her request, Ms. Endresen was not provided a response to her whistleblower complaints that relate to public filings prior to the meeting.  Instead, prior to the meeting Ms. Endresen was provide with first quarter 2017 earnings release presentation which contained the following statement:

> Excess Bonus Accrual: Bonus payments were $7.8 million short of what had been accrued at 12/31/2016.  As no more payouts related to 2016 are expected, the remaining accrued liability was reversed and offset by a credit to incentive compensation expense in March 2017.

> The Company determined that the over-accrual represented a change in estimate and not an error in accordance with applicable accounting standards (ASC 250).

64.      On May 1, 2017, in advance of that days Disclosure Committee meeting, Ms. Endresen sent an email to Messrs. Turner, Boyle, Gelormino and Lashley.  In that email, Ms. Endresen wrote that she did not believe that the statements in the 2017 earnings release presentation regarding "Excess Bonus Accrual" were factual, explaining:

> I believe the original accrual was in line with bonus plans that had been communicated to employees by the executives of the company.  In particular Managing Directors were told to expect a target of 100% of base, with a 75% cash payout, and 25% equity payout.  Such a payout was in line with prior years.

> I believe that after the departure of the prior CEO in January, the Board of Directors arbitrarily changed their own decision to accrue the bonus pool.  The decision appears to have been motivated by a cost-cutting agenda, however this reverse accrual is effectively retro-active cost-cutting.  Additionally, this retroactive cost-cutting breached the promises made by Executives of the company to its employees.  At a minimum, I believe the breach in promised payouts creates a contingent liability to the company that should be recorded in the financial statements.

> Finally, it is my understanding that the reduced bonus payouts were not applied to individuals consistently.  Some received much higher payouts than others, and such payouts were not based on merit, as there was no Performance Management Ratings given to Managing Directors for 2016, and some who received larger bonus payouts as well as high salary increases (as high as 33.3%) were actually below plan for 2016.  This is indicative of a bonus plan being applied arbitrarily and retroactively.

65.    During the May 1, 2017 Disclosure Committee meeting, Ms. Endresen went on record as to her disagreement on the justification and validity of reversing the 2016 bonus accrual which improperly shifted $7.8 million in earnings from 2016 to 2017.  Mr. Turner simply indicated that this would be added to the minutes of the meeting, and no further discussion was allowed and that there would be no changes to the decision to make the reversal.  In short, Ms. Endresen was effectively forced to become part of the false disclosures that were occurring by being required to sit on the Disclosure Committee as part of her job but having any input or objections she made as a member of the Disclosure Committee summarily dismissed.

## F.    Plaintiff Is Constructively – and Wrongfully – Discharged.

66.    Banc's retaliatory actions in cutting Ms. Endresen's pay, undercutting her by attacking her credibility without any basis, threatening to fire her, forcing her to be complicit in the Sarbanes Oxley violations by placing her on the Disclosure Committee, and marginalizing her to the point where she could no longer effectively perform her job pushed Ms. Endresen out, amounting to her wrongful constructive termination.

67.    On May 29, 2017, Ms. Endresen sent Mr. Bowers a detailed letter outlining her complaints, the company's retaliatory behavior, and the Banc's failure to rectify and its illegal conduct.  Ms. Endresen explained in no uncertain terms that she was being forced to quit, effective immediately.

68.    On May 30, 2017, Mr. Bowers contacted Ms. Endresen by phone to acknowledge having received her letter.  Shockingly, he told her that very recently, another employee had come forward with similar complaints about Francisco Turner.  He

stated that the new complaint went even further than Ms. Endresen's which prompted the hiring of an independent investigator.  He asked Ms. Endresen to cooperate with this investigation.  It is important to note that Mr. Bowers did not request that she return to work at any point after she informed the company of her constructive wrongful termination.  However, during this phone call Ms. Endresen asked Mr. Bowers to have Banc continue to pay her family's health insurance premium for 6 months so that her son would not have his queue position disrupted for a newly FDA-approved medical device which he desperately needed.  He agreed to do so.  Later, when the Banc was asked if it was going to begin the COBRA payments, the Banc reneged, causing considerable emotional distress.  Ms. Endresen was forced to change insurance plans due to cost, and her son was put at the back of the queue for the device.  The device later "sold out" and the manufacturer did not deliver the device to the Endresen family until January, 2018. This has caused considerable emotional distress to Ms. Endresen and her family.

69.    Weeks later, not surprisingly, the Bank announced the "resignation" of Francisco Turner.  However, Ms. Endresen believes the disclosures around his departure also amount to false disclosures given her knowledge of the situation.  He was paid a severance of $2.75 million, which seems very unusual given the good cause the Bank had to terminate him, suggesting that there may have been ulterior motives to protecting Mr. Turner from Ms. Endresen's complaints all along.

70.    Following Ms. Endresen's wrongful termination, Ms. Endresen discovered that Doug Bowers defamed her to prospective employers.  Doug Bowers lied to Ms. Endresen's prospective employers about the quality of her work and her loan success rates.

71.    Here, Plaintiff was forced to quit, as would any other reasonable person in her situation, and consequently "Good Reason" exists for Plaintiff's departure from Banc. Defendant breached its financial obligations to Plaintiff by not paying out her earned bonuses, and by retaliating against her.  Plaintiff provided detailed and satisfactory notice to Defendant giving rise to the Good Reason.  Defendant wrongfully terminated Plaintiff,

and to date as failed to pay out on her severance in retaliation for her complaints of illegal conduct.

**FIRST CAUSE OF ACTION**
**Violation of Sarbanes-Oxley Act**
**[18 U.S.C. §1514A]**
**(By Plaintiff Against All Defendants)**

72.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

73.     Banc is a company with a class of securities registered under Section 12(b) of the Securities Exchange Act of 1934 (the "Exchange Act"),) and is therefore subject to ongoing disclosure requirements designed to keep investors informed on a current basis of information concerning material changes in its financial condition and operations. These requirements include an obligation to file periodic reports on Form 10-K and Form 10-Q and current reports on Form 8-K with the Securities and Exchange Commission (the "SEC").  Accordingly, Banc is subject to 18 U.S.C. § 1514A.

74.     At all times herein mentioned, Banc was also required by 15 U.S.C. § 78m(b)(2) to "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (B) devise and maintain an adequate system of internal accounting controls sufficient to provide reasonable assurances that – (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization...."

75.     In addition, at all relevant times, Banc was subject to the requirements of 15 U.S.C. § 78m(b)(5), which prohibited attempts to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book,

1  record, or account described in paragraph 12."

2      76.    Plaintiff is an employee, and Banc is an employer, within the meaning of 18

3  U.S.C. § 1514A.

4      77.    Plaintiff provided information to her supervisors at Banc, individuals at

5  Banc who had the authority to investigate, discover, or terminate misconduct and

6  members of Banc's Board of Directors, which Plaintiff reasonably believed constituted a

7  violation of one or more rules or regulations of the SEC and/or other provisions of

8  Federal law relating to fraud against shareholders.   Specifically, Plaintiff advised her

9  supervisors at Banc and members of Banc's board of directors that Banc's decision to not

10 pay the already accrued 2016 incentive compensation and to reverse approximately $7.8

11 million of the accrued 2016 incentive compensation in the first quarter of 2017 was not –

12 as Banc claimed in its press release and in its 10-Q for the quarter ended March 31, 2017

13 – a "change in estimate" that was based "on new information driven by changes to certain

14 facts and circumstances," but was instead a deliberate decision made by Banc to increase

15 its otherwise flagging earnings for the first quarter of 2017.   Thus, even if the decision to

16 not pay the accrued 2016 incentive compensation was appropriate – which it was not –

17 the reversal of approximately $7.8 million of accrued 2016 incentive compensation

18 should have resulted in an increase in year-end 2016 earnings – not first quarter of 2017

19 earnings.

20     78.    Banc was aware that Plaintiff engaged in the protected activity of providing

21 information she reasonably believed constituted violations of one or more rules or

22 regulations of the SEC and/or other provisions of Federal law relating to fraud against

23 shareholders.

24     79.    Banc's conduct in threatening, harassing, and constructively terminating

25 Plaintiff, as described above, constitutes unlawful retaliation pursuant to 18 U.S.C. §

26 1514A.

27     80.    As a direct and proximate result of Banc's retaliation against Plaintiff,

28 Plaintiff has suffered actual, consequential and incidental financial losses, including

without limitation, loss of earnings and other employment benefits, and the intangible loss of employment-related opportunities, all in an amount subject to proof at the time of trial.

81.   As a further direct and proximate result of Banc's retaliation against Plaintiff, Plaintiff has suffered and continues to suffer, humiliation, mental anguish, and emotional and physical distress, all in an amount subject to proof at the time of trial.

82.   As a further direct and proximate result of the foregoing conduct, Plaintiff has incurred attorneys' fees and costs in an amount according to proof.

83.   The conduct of Banc as described herein was authorized, condoned, perpetrated and/or ratified by a managing agent or officer of Banc.  These acts were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Banc's future conduct.

WHEREFORE, Plaintiff prays judgment against Defendants as hereafter set forth.

### SECOND CAUSE OF ACTION
**Whistleblower Retaliation**
**[Cal. Labor Code, § 1102.5]**
**(By Plaintiff Against All Defendants)**

84.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

85.   Section 1102.5(b) of the Labor Code provides, in relevant part: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses

a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation[…]"

86. Section 1102.5(c) of the Labor Code provides: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation."

87. Plaintiff had reasonable cause to believe that Banc's practices, as described herein, violated U.S. federal law and California state law, including, but not limited to: (i) one or more rules or regulations of the SEC and/or other provisions of Federal law relating to fraud against shareholders; (ii) California Government Code §§ 12940, *et seq*.; and (ii) California Corporations Code § 25401.

88. Plaintiff disclosed information regarding what she reasonably believed to be Banc's unlawful practices to persons at Banc with authority over Plaintiff and other employees of Banc.

89. Plaintiff refused to participate in activities that she reasonably believed to constitute unlawful practices.

90. Banc had direct knowledge of Plaintiff's protected activity under Labor Code section 1102.5.

91. In retaliation for her complaints of Banc's unlawful activities and her refusal to participate in activities that she reasonably believed to constitute unlawful practices, Banc threatened, harassed and constructively terminated Plaintiff in violation of Labor Code section 1102.5.

92. As a direct and proximate result of the retaliation by Banc, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of earnings and other employment benefits, and the intangible loss of employment-related opportunities, all in an amount subject to proof at the time of trial.

93. As a further direct and proximate result of the retaliation by Banc, Plaintiff has suffered and continues to suffer, humiliation, mental anguish, and emotional and

physical distress, all in an amount subject to proof at the time of trial.

94.     As a further direct and proximate result of the foregoing conduct, Plaintiff has incurred attorneys' fees and costs in an amount according to proof.

95.     The conduct of Banc as described herein was authorized, condoned, perpetrated and/or ratified by a managing agent or officer of Banc.  These acts were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Banc's future conduct.

WHEREFORE, Plaintiff prays judgment against Defendants as hereafter set forth.

### THIRD CAUSE OF ACTION
**Wrongful Termination in Violation of Public Policy**
**[California Common Law]**
**(By Plaintiff Against All Defendants)**

96.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

97.     Under California law, no employee, whether they are an at-will employee, or an employee under a written or other employment contract, can be terminated for a reason that is in violation of a fundamental public policy.  Thus, when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions.

98.     The above-described conduct of Defendants constitutes wrongful constructive termination of Plaintiff in violation of public policy.  It is against the public policy of the State of California for an employer to terminate an employee because she reports within the company that the company may be engaged in an unlawful activity or conduct that she reasonably believes to constitute unlawful activity.

99.     As set forth herein, the actions of Banc was wrongful and in violation of fundamental public policies of the State of California and the United States of America,

as reflected in the laws, objectives, and policies including, without limitation and merely by way of example: (i) 18 U.S.C. § 1514A; (ii) California Labor Code § 1102.5; (iii) California Government Code §§ 12940, et seq.; and (iv) California Corporations Code § 25401. These statutes are not the entirety of the universe of statutes that embody the public policies at issue here but are merely representative and illustrative examples of such statutes. Plaintiff expressly reserves the right to rely on and assert other statutes that embody these same or similar public policies as the basis for this claim.

100. Plaintiff disclosed information regarding what she reasonably believed to be Banc's unlawful practices to persons with authority over Plaintiff and other employees of Banc.

101. Plaintiff refused to participate in activities that she reasonably believed to constitute unlawful practices.

102. Banc had direct knowledge of Plaintiff's complaints of Banc's unlawful activities and her refusal to participate in activities that she reasonably believed to constitute unlawful practices.

103. Banc's discharged Plaintiff in retaliation for her complaints of Banc's unlawful activities and her refusal to participate in activities that she reasonably believed to constitute unlawful practices.

104. Plaintiff's termination was wrongful and against the public policy of the State of California.

105. As a direct and proximate result of the involuntary discharge from employment by Banc, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of earnings and other employment benefits, and the intangible loss of employment-related opportunities, all in an amount subject to proof at the time of trial.

106. As a further direct and proximate result of the involuntary discharge from employment by Banc, Plaintiff suffered and continues to suffer, humiliation, mental anguish, and emotional and physical distress, all in an amount subject to proof at the time

of trial.

107.   As a further direct and proximate result of the foregoing conduct, Plaintiff has incurred attorneys' fees and costs in an amount according to proof.

108.   The conduct of Banc as described herein was authorized, condoned, perpetrated and/or ratified by a managing agent or officer of Banc.  These acts were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Banc's future conduct.

WHEREFORE, Plaintiff prays judgment against Defendants as hereafter set forth.

**FOURTH CAUSE OF ACTION**
**Unlawful Harassment and Retaliation in Violation of FEHA**
**[Cal. Government Code, §§ 12940 *et seq.*]**
**(By Plaintiff Against All Defendants)**

109.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

110.   Banc is an "employer" within the meaning of and subject to California Government Code Section § § 12900 et seq., commonly referred to as the California Fair Employment and Housing Act ("FEHA").

111.   Section 12940, subdivision (h), of California's Government Code makes it unlawful for an employer to "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

112.   Section 12940, subdivision (j), of California's Government Code makes it unlawful for an employer or any other person to harass employees because of their sex.

113.   Section 12940, subdivision (k), of California's Government Code makes it unlawful for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

114.   At all relevant times, Plaintiff was a woman and thus was a member of the

protected class of "sex" within the meaning of California Government Code sections 12926, subdivision (r), and 12940. At all times during Plaintiff's employment, she satisfactorily performed her job duties and was otherwise qualified to perform her job but for Banc's harassing and discriminatory conduct.

115. As a direct result of Banc's actions as described above, Plaintiff was subjected to unlawful harassment and a hostile work environment.

116. As described above, Plaintiff participated in the protected activities of opposing, complaining and protesting against gender discrimination and sexual harassment.

117. In retaliation for her engaging in the protected activities of opposing, complaining and protesting against gender discrimination and sexual harassment, Banc threatened, harassed and constructively terminated Plaintiff.

118. As a direct and proximate result of the unlawful harassment and/or retaliation by Banc, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of earnings and other employment benefits, and the intangible loss of employment-related opportunities, all in an amount subject to proof at the time of trial.

119. As a further direct and proximate result of the unlawful harassment and/or retaliation by Banc, Plaintiff has suffered and continues to suffer, humiliation, mental anguish, and emotional and physical distress, all in an amount subject to proof at the time of trial.

120. As a further direct and proximate result of the foregoing conduct, Plaintiff has incurred attorneys' fees and costs in an amount according to proof.

121. The conduct of Banc as described herein was authorized, condoned, perpetrated and/or ratified by a managing agent or officer of Banc.  These acts were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Banc's future conduct.

WHEREFORE, Plaintiff prays judgment against Defendants as hereafter set forth.

## FIFTH CAUSE OF ACTION
### Breach of Contract
### [California Common Law]
### (By Plaintiff Against All Defendants)

122.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

123.   On or about April 1, 2015, Plaintiff and Banc entered into a written employment agreement (the "Employment Agreement").

124.   Plaintiff performed and satisfied her obligations under the Employment Agreement and complied with all material terms of the Employment Agreement.

125.   Banc breached Plaintiff's Employment Agreement by, *inter alia*: (i) improperly refusing to pay Plaintiff all monies due under the Employment Agreement; (ii) improperly refusing to pay Plaintiff her entire earned 2016 year-end bonuses; (ii) improperly refusing to pay Plaintiff her severance as required by the Employment Agreement because she was forced to quit with "Good Reason"; and (iii) constructively terminating Plaintiff without cause, wrongfully and unlawfully in retaliation for Plaintiff's complaints regarding Banc's unlawful activities.

126.   As a direct and proximate result of Banc's breach of the Employment Agreement, Plaintiff has suffered harm, including actual, consequential and incidental financial losses, all in an amount subject to proof at the time of trial.

127.   As a further direct and proximate result of the foregoing conduct, Plaintiff has incurred attorneys' fees and costs in an amount according to proof.

WHEREFORE, Plaintiff prays judgment against Defendants as hereafter set forth.

**COMPLAINT**

## SIXTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing
### [California Common Law]
### (By Plaintiff Against All Defendants)

128.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

129.   On or about April 1, 2015, Plaintiff and Banc entered into a written employment agreement (the "Employment Agreement").

130.   The Employment Agreement contained an implied covenant of good faith and fair dealing which requires that Banc would not do anything to injure, frustrate or interfere with the rights of Plaintiff under her Employment Agreement, or engage in any act or omission that was intended to or had the natural tendency to deprive Plaintiff of the benefits of that bargain, including the right to continued employment absent good cause for discharge.

131.   Banc breached the implied covenant of good faith and fair dealing by, *inter alia*: (i) improperly refusing to pay Plaintiff all monies due under the Employment Agreement; (ii) improperly refusing to pay Plaintiff her entire earned 2016 year-end bonuses; (ii) improperly refusing to pay Plaintiff her severance as required by the Employment Agreement because she was forced to quit with "Good Reason"; and (iii) constructively terminating Plaintiff without cause, wrongfully and unlawfully in retaliation for Plaintiff's complaints regarding Banc's unlawful activities.

132.   As a direct and proximate result of Banc's breach of the Employment Agreement, Plaintiff has suffered harm, including actual, consequential and incidental financial losses, all in an amount subject to proof at the time of trial.

133.   As a further direct and proximate result of the foregoing conduct, Plaintiff has incurred attorneys' fees and costs in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against Defendants, as set forth herein below.

### SEVENTH CAUSE OF ACTION
**Failure to Pay All Wages Due Upon Termination**
**[Cal. Labor Code §§ 201, 203]**
**(By Plaintiff Against All Defendants)**

134.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

135.   Sections 201 and 202 of California's Labor Code require employers to pay employees all wages due within 72 hours of termination of employment.  Section 203 of the Labor Code provides that if an employer willfully fails to timely pay such wages the employer must, as a penalty, continue to pay the subject employees' wages until the back wages are paid in full or an action is commenced.  The penalty cannot exceed 30 days of wages.

136.   All wages owed to Plaintiff became due on or about her last day of employment

137.   In violation of California law, Banc failed to pay Plaintiff wages due to her in a timely manner by failing to include all wages in Plaintiff's final payment of wages.

138.   As a proximate result of Banc's willful, knowing and intentional violation of the Labor Code sections invoked herein, Plaintiff has sustained damage in an amount to be proven at trial.

139.   Plaintiff is entitled to recover reasonable attorneys' fees and costs, together with waiting time penalties and interest under sections 203 and 218.5 of the Labor Code, in having to bring this action to obtain wages due to Plaintiff.

WHEREFORE, Plaintiff prays for judgment against Defendants, as set forth herein below.

/ / /

/ / /

/ / /

**COMPLAINT**

### EIGHTH CAUSE OF ACTION
**Unlawful, Deceptive, and/or Unfair Business Practices**
**[Cal. Bus. & Prof. Code, §§ 17200, *et seq.*]**
**(By Plaintiff Against All Defendants)**

140.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 71, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

141.   California's Unfair Competition Law (Cal. Bus. & Prof. Code, §§ 17200, *et seq.*) prohibits acts of unfair competition, which is means and includes "any unlawful, unfair or fraudulent business act or practice."

142.   Banc violated California's Unfair Competition Law by the conduct alleged above including, but not limited to:

      i.   violations of California Labor Code, § 1102.5;

      ii.   breach of contract;

      iii.   breach of the covenant of good faith and fair dealing; and

      iv.   violations of California Labor Code, §§ 201, 202 and 203.

143.   By violating the above statutes, regulations and orders, and by failing to take appropriate measures to address these violations, Banc's acts constitute *per se* acts of unlawful and/or unfair business practices under California's Business and Professions Code sections 17200, *et seq*.

144.   As a direct, foreseeable, and proximate result of Banc's acts and omissions alleged herein, and within the relevant statutory period, Plaintiff has been deprived of compensation and wages to which she is entitled by law, all redounding to the unjust enrichment of Banc's.  Accordingly, Plaintiff is entitled to restitution of such wages as is specifically authorized by Business & Professions Code section 17203.

      WHEREFORE, Plaintiff prays for judgment against Defendants, as set forth herein below.

/ / /

/ / /

**COMPLAINT**

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

1. General and special damages, according to proof;

2. Loss of earnings, according to proof;

3. Restitution of all monies due to Plaintiff;

4. Penalties pursuant to Labor Code § 203;

5. Punitive damages on the First, Second, Third and Fourth Causes of Action, in an amount sufficient to punish Defendants, make an example of them, and deter future unlawful conduct;

6. Pre-judgment interest;

7. Costs of suit including and expenses incurred herein;

8. Reasonable attorneys' fees pursuant to 18 U.S.C. 1514A(c)(2), California Labor Code § 218.5, California Government Code § 12965 and California Code of Civil Procedure § 1021.5; and

9. Such other and further relief as the Court may deem just and proper.

Dated: May 23, 2018                     ARIAS, SANGUINETTI, WANG
                                        & TORRIJOS, LLP


                                        By:   /s/  Mike Arias
                                            Mike Arias
                                            Alfredo Torrijos


                                        BEROKIM & DUEL, P.C.
                                        Jasmine A. Duel
                                        Kousha Berokim

                                        *Counsel for Plaintiff Heather Endresen*

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in the instant action.

Dated:  May 23, 2018                    ARIAS, SANGUINETTI, WANG
                                        & TORRIJOS, LLP

                                        By:  _/s/  Mike Arias_____
                                             Mike Arias
                                             Alfredo Torrijos

                                        BEROKIM & DUEL, P.C.
                                        Jasmine A. Duel
                                        Kousha Berokim

                                        *Counsel for Plaintiff Heather Endresen*

**COMPLAINT**